(98 App. Div. 620)
### PEOPLE ex rel. CROSS v. GREENE, Police Com'r.

(Supreme Court, Appellate Division, First Department. November 11, 1904.)

1. CERTIORARI—DISMISSAL FROM POLICE FORCE—QUESTIONS REVIEWABLE.
On certiorari to review the action of the police commissioner in dismissing a police inspector, it is the duty of the Appellate Division, under the express provisions of Code Civ. Proc. § 2140, to determine whether there was competent proof of the facts necessary to justify a conviction, and, if so, whether such a preponderance of the evidence was against the decision that a similar verdict of a jury would be set aside as against the weight of the evidence.

2. SAME—SUFFICIENCY OF EVIDENCE.
On certiorari to review relator's dismissal as police inspector, evidence considered, and *held* insufficient to show relator guilty of neglect of duty.

Certiorari by the people, on the relation of Adam A. Cross, against Francis V. Greene, as police commissioner of the city of New York, to review the dismissal of relator from the office of police inspector. Judgment of dismissal reversed.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Elihu Root, for relator.
Terence Farley, for respondent.

PATTERSON, J. The relator was an inspector in the police department of the city of New York. Charges were preferred against him on the 26th of February, 1903, by the then chief inspector of that department. A hearing or trial was had upon such charges and the specifications thereof before the deputy commissioner of police, who found the relator guilty, and recommended his dismissal from the force. On May 6, 1903, the then police commissioner approved the findings and recommendation of the deputy commissioner, and thereupon the relator was dismissed.

The charges preferred against Inspector Cross are, first, conduct unbecoming an officer; second, neglect of duty. The specifications of these charges are, first, that between September 21, 1897, and November 20, 1900, the relator neglected to suppress two disorderly houses (one at 56 Stanton street, and the other at 32 Stanton street) in the borough of Manhattan, in the city of New York; second, that between October, 1900, and May, 1901, he neglected to suppress a disorderly house at 27 Stuyvesant street; third, that between September 1, 1899, and December 1, 1900, he neglected to suppress disorderly houses at 201 Allen street, 140 Chrystie street, 51 Eldridge street, 21 Rivington street, and 49 DeLancy street, in the same borough; fourth, that he neglected to suppress poolrooms at No. 293 Bowery and 9 St. Mark's place between April, 1899, and June 15, 1901; fifth, that between April 15, 1899, and December 21, 1900, he neglected to suppress a poolroom

at 114 East Thirteenth street. All these places were within the inspection district of the relator; that is to say, the First Inspection District of the borough of Manhattan, in the city of New York.

In reviewing the evidence contained in the four bulky volumes of printed matter before us, it is our duty to determine whether there was competent proof of the facts necessary to be proved to justify a conviction, and, if so, then to determine whether there was such a preponderance of evidence against the determination of the commissioner as would necessitate setting aside a verdict, as against the weight of evidence, had a jury found the existence of such facts in an action in the Supreme Court. People ex rel. McAleer v. French, 119 N. Y. 502, 23 N. E. 1061; People ex rel. Stephenson v. Greene, 92 App. Div. 245, 87 N. Y. Supp. 172; Code Civ. Proc. § 2140. We are of the opinion that the evidence adduced against this relator was insufficient to convict him of the charges made against him, and the specifications thereof. There is no proof of the first charge as an independent offense, or otherwise than as associated with the second charge.

At the outset of the inquiry there are considerations which force themselves upon the attention of the court. Each specification is of alleged neglect of duty long anterior to the date at which the charges were preferred, and the derelictions imputed to the relator are stated as offenses occurring during the administration of police commissioners and chiefs of police, all of whom have testified in this matter to the capacity, skill, and efficiency of Inspector Cross, and to his faithful discharge of duty. It is also observable that the specifications of the charges refer only to neglect. The relator is not charged with connivance at vice, with the protection of vicious persons, with corruption, or with using the position of an important official for personal gain. The real gist of the charge of neglect is the relator's failure to suppress vice in specified instances, and there is involved in the charge a willful abstinence from the performance of duty, with knowledge of the places mentioned in the specifications, or supineness and indifference; he having at his command all the agencies and means through which, in the discharge of duty, he procured or could have procured full information and knowledge upon which to act. It is material to consider what his position was, and what were his duties. He was bound to see to the enforcement of the law, and, as far as possible, that vice should be suppressed. In that regard, his was the same duty as that incumbent upon every member of the police force, from the commissioner down to the ordinary patrolmen—each in his own sphere. The first and perhaps the most important duty of an inspector is the supervision of the large force under his command, and within his inspection district. The relator's district, from 1897 to 1901, consisted of all the territory south of Fourteenth street, and bounded on the west by Fourth avenue, Park Row to Ann street, to Broadway, to Whitehall street, to the Battery, the East river to Fourteenth street. In 1898 that part of the Fourth Precinct which consists of the Brooklyn Bridge and the station house in Brooklyn was added. There were eight different police precincts in that inspection district, each in charge of a captain, and were the 1st, 4th, 5th, 7th, 12th, 13th, 14th, and 15th. In those precincts were comprised the Wall street district, occupied by banks, trust com-

panies, and insurance companies; the Brooklyn Bridge; the lower East Side, with a seething population of different nationalities, between 75,000 and 100,000 in number; a tenement house district with a population of 150,000; another containing residents, nearly all of foreign birth, to the number of about 200,000; another including the river front, with a population of about 150,000 dwelling in tenement houses; another with about the same population; and still another fully as populous.

The relator had the administration as inspector of this inspection district for years, and the real charge preferred against him is of alleged negligence respecting a few particular places. In the first specification the alleged negligence is stated to have occurred between 3 and 6 years before the charges were presented; that in the second specification, between 21 and 28 months before the charges were filed; that in the third, between 2½ and 3 years before such filing; and that in the fourth, between 1½ and 3½ years prior to such filing; and that in the fifth, between 2 and 4 years prior to such filing.

In the first specification the neglect to suppress is charged with respect to two houses; in the second, to one; in the third, to four, but on the hearing that specification with reference to two of those places was abandoned. The fourth specification relates to one place, and the fifth to another. So that during all the years covered by these specifications the negligence is imputed only as to seven separate places. It has been very earnestly argued on behalf of the relator that an inquiry into what he considers the remote past to find an accusation against him evinces something on the part of those who preferred the charges other than a zealous desire to benefit the public. But we can see no reason for arraigning the motives of the police commissioner, notwithstanding what may be called the staleness of the charges. It is immaterial whether the offenses were committed shortly or long before the charges were presented. If the police commissioner considered it for the good of the public service that unworthy or negligent police officials should be dismissed from the force, it was his duty to bring them to trial, and to seek the accomplishment of that praiseworthy object. Nevertheless it remains in this case that the relator has received the commendation of every one of his superior officers for the general excellent character of his work during the periods of time covered by these charges. How efficient the action of the police under Mr. Cross was is disclosed in this record, and is shown by the great number of houses of prostitution broken up, keepers and inmates arrested, and the number of poolrooms suppressed in his inspection district during his administration. But notwithstanding his efficiency, his skill, and his general excellent performance of duty, if on this record, he could be found justly by a jury guilty of neglect as charged, all of his general efficiency and skill and merit should not and would not shield him from the consequences of proven neglect with respect to particular places. The greatest vigilance and the strictest discharge of duty should be required of police officials in the suppression of vice and in the enforcement of the law, and the mere perfunctory performance of that duty is as condemnable as willful and intentional disregard of it. But in cases of this character it is due to an accused person—especially

to one who is admitted to have been generally efficient and worthy in the discharge of his duty—that he should not be condemned, deprived of his position, and stigmatized without satisfactory and convincing proof upon which to base such condemnation.

Bearing in mind the nature of the particular charges made against this relator, his admitted or proven efficiency in the general discharge of duty, the absence of anything to inculpate him in willfully or with actual intent tolerating the existence of haunts of vice and immorality, we proceed to the consideration of the evidence in the record as to each one of the places mentioned in the specifications before us. That some of the precincts within Inspector Cross' inspection district were infested with vicious persons, and had within their boundaries many places of resort for such persons, is proven. It is also proven that during the administration of his department the moral condition of those precincts was greatly improved. It is shown that within the period covered by these charges he was exceedingly active and energetic in his efforts to suppress houses of prostitution and poolrooms. Between October, 1887, and June, 1901, he considered nearly 4,000 complaints and 700 inquiries, of which 378 related to poolrooms, and 615 to disorderly houses. In the Twelfth Precinct, between September, 1897, and June, 1901, 139 arrests were made of persons charged with maintaining and keeping disorderly houses, and 546 arrests of inmates of those houses were made, and 2,405 arrests of women for soliciting. In the Fifteenth Precinct during the same period 67 arrests were made for keeping disorderly houses, and 10 for keeping poolrooms, 18 for keeping gambling houses and 38 for gambling; and 2,655 street walkers were also arrested. Inspector Cross relied upon the reports of his captains largely for police information as to their respective precincts. Those captains are charged with the more immediate responsibility for the detection of crime and vice in their several precincts. Concerning the places specifically named in the specifications of the charges against the relator, it is not to be doubted that during much of the time mentioned they were used as places of prostitution or for poolrooms, and here it is important to understand what was done by the police as to those places.

The first specification relates to the houses Nos. 56 and 32 Stanton street. The first-named house appeared upon the report of the captain September 27, 1897. This report was made to Inspector Cross' superior officer, but came into his hands. With reference to this house, the woman keeping it was arrested in December, 1897; a man who kept it was arrested in April, 1898; another person was arrested for keeping it in July, 1899; another arrest was made in October, 1900; and three arrests were made for disorderly conduct in that house in April, 1898; and the house was reported discontinued in March, 1901. No. 32 Stanton street appeared upon the captain's report of suspected places in September, 1897. The place was broken up by the police in February, 1901. Meantime the keeper was arrested four or five times for keeping this house, and was indicted.

The second specification is to the effect that the relator neglected to suppress the disorderly house No. 27 Stuyvesant Square between October, 1900, and May, 1901. That was a foul den of prostitutes. It first appeared upon the captain's report June 1, 1901. The evidence relating to it shows that the attention of Inspector Cross was first called to it by a letter written to the chief of police on the 26th of November, 1900, which advised him of the general fact that within his jurisdiction were alleged houses of prostitution and of assignation, in the vicinity of churches and schools. That communication was referred by the inspector to the precinct captain for investigation and report, and he reported that 14 detectives or patrolmen doing duty in citizens' clothes, and constantly under his direction, and exercising the utmost vigilance to detect and suppress all houses of prostitution and assignation, reported to him that they had been unable to find any evidence to confirm the statement or report made to the chief of police relative to alleged houses of prostitution or assignation in the vicinity of churches and schools within his precinct; No. 27 Stuyvesant Square being in that precinct. Notwithstanding this statement of the captain, this infamous place did exist. But the present record shows that there was a policeman in front of this house night and day from November, 1900, to February 21, 1901; that the house was eventually suppressed; that the keeper was arrested for maintaining a disorderly house on the 2d of May, 1901, and at subsequent dates during the inspectorship of the relator. The difficulty of obtaining evidence with reference to this house, and the success for a long time of those inhabiting it in escaping (although whether by complicity with certain of the lower police officials or otherwise does not appear in this record), is very remarkable, but might be explained if we were permitted to resort to records in other cases that have been before us. We cannot conclude, however, that it was the fault of the relator.

Concerning the third specification, as before stated, the proof relates only to the houses 201 Allen street and 140 Chrystie street. The first mentioned is alleged to have existed from December, 1899, to December, 1900. It does not appear on the captain's report of suspected places until January, 1900. It was closed up by the police in October, 1900. Meantime, from September 4, 1899, to May 18, 1900, no less than 15 persons were arrested, male and female, from this house, for soliciting and for warning prostitutes. As to 140 Chrystie street, that place was never reported by the captain during the period mentioned in the specification, and was complained of but once to the chief of police in October, 1900. The captain reported that there was no evidence against the place, and that it had been watched.

The fourth specification relates to the failure of the relator to suppress between April 15, 1899, and June 15, 1901, a poolroom or poolrooms at 295 Bowery and 9 St. Mark's Place; and the fifth specification is that between April 15, 1899, and December 21, 1900, the relator neglected to suppress a poolroom at 114 East Thirteenth street. We think it is plainly shown with reference to

the poolrooms that during the periods mentioned the difficulty was in securing evidence of their character. The proof shows that every complaint that was made and came to the knowledge of the relator was investigated through those channels to which he was entitled to resort for the purpose of obtaining evidence to substantiate the complaints made.

It has been properly urged that the inspector is not an insurer that vice will not exist or crime be committed in his inspection district. He is bound, however, to resort to every agency to detect crime and vice, in order that it may be punished or suppressed. We are unanimously of opinion in this case that with reference to each particular specification there is insufficient evidence to convict this relator of a neglect of duty concerning the place mentioned therein, whatever may be said of the neglect of others who may have been charged with responsibility for the existence of each and all of those places during the times mentioned.

Our conclusion, upon an examination of the record, is that Inspector Cross should not have been convicted of the charges which amount to those of nonfeasance and inaction alone; and if a jury had found him, on this evidence, guilty of that nonfeasance or inaction, in respect to any one of the places named in the specifications, we should have felt compelled to set aside the verdict.

The writ should be sustained, the proceedings annulled, and the relator reinstated, with $50 costs and disbursements.

INGRAHAM, McLAUGHLIN, and LAUGHLIN, JJ., concur.

VAN BRUNT, P. J. I differ with that part of the opinion in which it is said that the age of many of the offenses ought not to be considered. It seems to me that the willingness to resort to such stale alleged offenses evidences a disposition which requires the closest scrutiny of the proceeding. Otherwise I concur.